United States District Court
Middle District of Florida
Jacksonville Division

**STEPHEN C. MEEKS,**

    *Plaintiff,*

v.                                    **NO. 3:25-cv-506-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

    *Defendant.*

---

## Order

Proceeding under 42 U.S.C. § 405(g), the plaintiff requests judicial review of a final decision by the Commissioner of Social Security. Doc. 1. He raises five issues. Doc. 11. The procedural history, evidence, and law are summarized in the Administrative Law Judge's (ALJ's) decision, Tr. 954–73, and the parties' briefs, Docs. 11, 14, and not fully repeated here. The pertinent period is September 1, 2020, to March 3, 2025. Tr. 973.

### 1.

Section 405(g) details the scope of review:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner …, with or without remanding the cause for a rehearing. The findings of the Commissioner … as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner … or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to

the hearing before the Commissioner …, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed …, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoted authority omitted).

**2.**

The plaintiff argues that the ALJ erred in failing to ensure a complete record because the following "EXPLANATION OF DETERMINATION," which explained that the plaintiff can still perform work requiring "only a very short, on-the-job training period," was absent from the transcript:

```
----------------------------------------------------------------
              E X P L A N A T I O N   O F   D E T E R M I N A T I O N
----------------------------------------------------------------


  Name:              NH's Name (CDB/DWB):    Claim Number:   Claim Type:

  STEPHEN MEEKS                              5126733         DIB
----------------------------------------------------------------


  The following evidence was used to decide your claim:


  FEDERAL JHIE REPORT RECEIVED 03/26/2021
  FEDERAL JHIE #3 REPORT RECEIVED 08/05/2021
  FEDERAL JHIE #2 REPORT RECEIVED 04/01/2021


  We have determined that your condition is not severe enough to keep you from
  working. We considered the medical record and other information, your age,
  education, training, and work experience in determining how your condition affects
  your ability to work.


  You state that you are disabled and unable to work because of hypertension, sleep
  apnea and posttraumatic stress disorder. We realize you are concerned about your
  condition and how it affects your ability to complete tasks. However, based on our
  review of the information in your case file, we have determined that you are
  capable of understanding and carrying out instructions, meeting general production
  and quality standards, and reporting to work on a regular and continuing basis.
  Although you may need treatment for your condition, and it may limit your ability
  to perform your past work, disability cannot be established because you are still
  capable of performing work that requires less physical effort, and only a very
  short, on-the-job training period.


  If your condition gets worse and keeps you from working, call or visit any Social
  Security Office about filing another application.
```

2

Doc. 11 at 7–12; Doc. 11-1. According to the plaintiff, reversal is warranted because work requiring only a very short on-the-job training period equates to an occupation with Specific Vocational Preparation (SVP) level 1,[1] and the ALJ made no significant-number finding for the identified occupation with SVP level 1.[2] Doc. 11 at 7–12.

The Social Security Administration (SSA) must develop a full and fair record. 20 C.F.R. § 404.1512(b). If the ALJ fails to fulfill her duty to fully develop the record, remand is warranted if "the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995) (internal quotation marks and quoted authority omitted).

---

[1]SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles, App'x C § II. The "training may be acquired in a school, work, military, institutional, or vocational environment." *Id*. The training "does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job." *Id*. An SVP level 1 requires only a short demonstration. *Id*. An SVP level 2 requires "[a]nything beyond short demonstration up to and including 1 month." *Id*.

[2]The ALJ concluded that, based on a vocational expert's (VE's) testimony, and considering the plaintiff's "age, education, work experience, and residual functional capacity," the plaintiff "can make a successful adjustment to other work that exists in significant numbers in the national economy." Tr. 973. The ALJ summarized the VE's testimony:

> The [VE] testified that …, [a hypothetical person sharing the plaintiff's pertinent characteristics] could perform the requirements of representative occupations such as a hand packager (DOT 920.587-018, medium exertion and unskilled, with an SVP of 2 – 76,894 jobs in the national economy), a cleaner II (DOT # 919.687-014, medium exertion and unskilled, with an SVP of 1 – 51,386 jobs in the national economy), and a stores laborer (DOT # 922.687-058, medium exertion and unskilled, with an SVP of 2 – 54,397 jobs in the national economy).

Tr. 972.

An ALJ is "responsible for reviewing the evidence and making administrative findings of fact and conclusions of law." 20 C.F.R. § 404.1513a(b). An ALJ "will consider prior administrative medical findings and medical evidence from … agency medical or psychological consultants[.]" *Id.* An ALJ is "not required to adopt any prior administrative medical findings, but … must consider this evidence …, as appropriate, because [the] consultants are highly qualified and experts in Social Security disability evaluation." *Id.* § 404.1513a(b)(1).

A prior administrative medical finding "is a finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by … agency medical and psychological consultants at a prior level of review." *Id.* § 404.1513(a)(5). When considering prior administrative medical findings, an ALJ must consider supportability, consistency, the relationship with the claimant, any specialization, and "other factors," including evidence that a medical source is familiar with the other evidence in the claim or understands the disability program's policies and evidentiary requirements. *Id.* § 404.1520c(c).

Here, the ALJ stated that, in finding the residual functional capacity (RFC), she "considered the … prior administrative medical findings," Tr. 960, and proceeded to analyze them:

> The prior administrative medical findings of state agency, non-examining psychologists Pamela Green, Ph.D., Theodore Weber, Psy.D., Jeannie Nunez, Psy.D., and James Levasseur, Ph.D. – who reviewed the available evidence of record in August of 2021, October of 2021, November of 2024, and December of 2024, respectively – are partially persuasive (see Exhibits 1A at 6-7, 9-11; 3A at 5-6, 7-9; 11A at 3-4, 5-6; 15A at 3-5, 5-7 [Tr. 108–09, 111–13, 122–26, 1061–64, 1079–83]). These consultants concluded that the [plaintiff]'s mental impairments caused up to moderate limitations

4

in the broad areas considered under the "paragraph B" criteria (Id). Functionally, they essentially found that the [plaintiff] was able to understand, remember, and carry out simple (and "detailed" or "complex") instructions; but might have some difficulties accepting instructions and/or criticism from supervisors and getting along with co-workers, and was best suited to work in an environment with limited public interaction; and might have some difficulties setting realistic goals, but could react or adapt to most workplace changes and task demands (Id). These consultants supported their conclusions with detailed narrative explanations that contained specific citations to the medical and other evidence of record (Id). For example, Dr. Levasseur observed that in September of 2024, the [plaintiff] was noted to have judgment that could be affected by poor frustration tolerance and a volatile disposition, as well as elevated psychomotor activity, but a mostly euthymic affect, proper eye contact, lucid thought content, and thought processes that were organized, coherent, and goal-directed (Id). In addition, the conclusions of these consulting psychologists are largely consistent with the remainder of the record as a whole, which has generally shown the [plaintiff] to be engageable and interactive, with proper eye contact, organized and goal-directed thought processes, clearly articulated and spontaneous speech, lucid thought content, and no evidence of thought content abnormalities, such as delusional ideations (see, for example, Exhibits 17F at 58–59, 72-73, 80, 98, 107; 18F at 5 [Tr. 1517–18, 1532–32, 1539, 1557, 1566, 1629]).

Tr. 968.

As required by the regulations, the ALJ developed the record, reviewed the prior administrative medical findings, and explained how she considered the factors. Contrary to the plaintiff's argument, the ALJ did not reversibly err in failing to ensure that the "EXPLANATION OF DETERMINATION" was in the record. As the Commissioner explains, disability examiners prepare explanations. Doc. 14 at 9–10; *see* SSA Program Operations Manual System DI 24501.001B(1)(d)(1)–(2). The ALJ had no obligation to consider the explanation, which is neither a medical finding nor any other form of evidence.

**3.**

The plaintiff argues that the ALJ erred in evaluating the medical opinions of Dr. Julie Bartholomae and Dr. Darrin Kirkendall. Doc. 11 at 12–27.

An ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ will consider supportability, consistency, the relationship with the claimant, any specialization, and "other factors," including evidence that a medical source is familiar with the other evidence in the claim or understands the disability program's policies and evidentiary requirements. *Id.* § 404.1520c(c).

The most important factors are supportability and consistency, and the ALJ must explain how she considered them. *Id.* § 404.1520c(a), (b)(2). Supportability concerns the support provided by the source issuing the opinion: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). Consistency concerns a comparison with other items in the record: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

The ALJ provided this summary of Dr. Bartholomae's opinions:

> The record shows that on August 5, 2020 – about a month before the alleged onset date – Julie Bartholomae, Ph.D., completed a disability benefits questionnaire in conjunction with a Veterans Affairs (VA) compensation and pension examination (see Exhibit 1F at 71–80 [Tr. 703–12]). It was noted in this document that the [plaintiff] reported having a good relationship with his two daughters, his sister, and his mother, although his relationship with his father was reportedly strained at times. [He] reportedly had friends, played golf with his friends every weekend, and also had neighbors that visited. He indicated that he and his spouse would go to dinner. However, he indicated that he avoided crowds. He stated that he was generally able to clean, do laundry, shop, manage money, and drive. He did report having difficulty driving to Jacksonville (due to crowds), that he was uncomfortable in unfamiliar environments, and that he had a fear of being on planes and in airports. Upon mental status examination, his eye contact was assessed to be good, and his speech normal. His affect was described as mildly irritated, but his insight, judgment, and reasoning reportedly appeared intact.
>
> Dr. Bartholomae noted that the [plaintiff] had reported a worsening of his symptoms since his previous examination. Regarding his occupational functioning, she opined that the [plaintiff]: needed a supervisor who would make reasonable accommodations for his psychiatric symptoms; might need longer breaks during the day and then return to complete his work; would work best on tasks that could be completed alone versus in a group; and might need more time than others to complete more complicated tasks, due to concentration issues (Exhibit 1F at 80 [Tr. 712]).

Tr. 962.

The ALJ detailed Dr. Olin Hamrick's disagreement with Dr. Bartholomae:

> During the [plaintiff]'s administrative hearing in February of 2023, independent medical expert Olin Hamrick, Ph.D., testified and provided a medical opinion. Dr. Hamrick indicated that the [plaintiff]'s severe impairments included PTSD with anxiety and a major depressive disorder, recurrent and moderate. Dr. Hamrick noted that the applicable listings would include 12.04, 12.06, or

12.15, and he opined that the [plaintiff] had no more than moderate limitations in understanding, remembering, and applying information; interacting with others; concentrating, persisting, and maintaining pace; and adapting or managing himself. Regarding the opinion of Dr. Bartholomae, Dr. Hamrick indicated that it was provided in the context of the VA criteria for unemployability, which is not the same as the SSA criteria for disability. He stated that he did not see any objective evidence in the VA records regarding the [plaintiff]'s actual capacity for work. He indicated that while the [plaintiff] has voiced subjective opinions and feelings, there is no vocational assessment and that Dr. Bartholomae's opinion appears to be based on a review of the evidence. He noted that Dr. Bartholomae did not appear to be a treating physician, but rather an evaluator for employability within the VA.

Tr. 965.

The ALJ provided this summary of Dr. Kirkendall's opinions:

Darrin Kirkendall, Ph.D., conducted a psychological consultative evaluation of the [plaintiff] in October of 2021 (Exhibit 7F [Tr. 861–67]). The [plaintiff] stated on this date that he had not been hospitalized for psychiatric reasons. As to his daily activities, he reported that he could attend to his personal hygiene, prepare food, do laundry, perform light chores, watch television, talk to his neighbors, and play golf. Upon examination, he was assessed to be cooperative. He presented as guarded at times and had some difficulty staying on topic due to anxiety. He was well groomed and made appropriate eye contact, and his expressive and receptive language skills were adequate. His attention and concentration were assessed to be mildly impaired. He could complete simple counting and calculation tasks, but was unable to complete the serial threes task from 20. His recent and remote memory skills were found to be mildly impaired. He recalled three of three objects immediately, but only one of the three objects after a five-minute delay. He was unable to recall a six-digit series in forwards order, and he was unable to recall a five-digit series in backwards order. Dr. Kirkendall's impressions included PTSD with panic attacks and major depressive disorder (recurrent and moderate). Dr. Kirkendall opined that the [plaintiff] had no limitation in his abilities to understand and follow simple directions or to perform simple tasks; a moderate limitation in his ability to maintain attention and concentration; a marked limitation in maintaining a regular schedule and dealing with stress appropriately; a moderate

8

limitation in his abilities to adequately relate with others; and no limitations in his abilities to learn new tasks, perform complex tasks, or make appropriate decisions (see Exhibit 7F [Tr. 861–67]).

….

In addition, Dr. Kirkendall conducted another psychological consultative examination of the [plaintiff] on May 9, 2024 (see Exhibit 14F [Tr. 1390–1400]). On objective mental status examination on this date, Dr. Kirkendall observed that the [plaintiff] initially presented as frustrated and animated regarding the process of applying for disability benefits (Id. at 5 [Tr. 1394]). He reportedly spoke for "a significant amount of time about his feelings of injustice" regarding this disability process, but was then "eventually able to more directly participate in the evaluation" (Id). Dr. Kirkendall noted that the [plaintiff] had some difficulty staying on topic and "occasionally" had to be redirected (Id). The [plaintiff] reportedly presented with restless motor behavior, an anxious and irritated affect, a dysthymic mood, and insight and judgment that were "fair" (Id. at 5–6 [Tr. 1394–95]). He also exhibited a few errors on memory testing "due to anxiety during the evaluation" (Id). He was able to recall only two out of three objects after a five-minute delay, and was unable to recall a series of six digits in forwards order or a series of five digits in backwards order (Id). However, he was also assessed to present as well groomed, with appropriate eye contact, a clear voice, fluid speech, adequate expressive and receptive language skills, and thought processes that were coherent and goal-directed, with no evidence of delusions or paranoia in the evaluation setting (Id). Furthermore, he did not commit any errors on attention and concentration testing during this evaluation (Id). In contrast to his previous evaluation with Dr. Kirkendall in October of 2021, the [plaintiff] did "successfully complete" the serial threes test from 20 during this evaluation in May of 2024 (Id). If anything, this indicates that the [plaintiff]'s ability to maintain concentration had improved to some extent since his evaluation with Dr. Kirkendall in October of 2021.

Tr. 963, 966.

The ALJ detailed Dr. Hamrick's disagreement with Dr. Kirkendall:

As for the opinion of consultative examining psychologist Dr. Kirkendall, Dr. Hamrick testified that there was nothing in his

evaluation report to support an opinion of marked limitation in the [plaintiff]'s ability to maintain a regular schedule or adapt to stress. Dr. Hamrick believed these opinions were based in substantial part on the [plaintiff]'s subjective reports. When asked by the [plaintiff]'s representative regarding Dr. Kirkendall's findings of guarded behavior, restlessness, and abnormalities of mood, affect, and behavior, Dr. Hamrick indicated that these findings did not support more than moderate limitations of function. Dr. Hamrick noted that the examination with Dr. Kirkendall reflected the [plaintiff] to exhibit appropriate dress and grooming, appropriate eye contact, fluent and clear speech, adequate expressive language, and no evidence of delusions or paranoia. Dr. Hamrick indicated that while the [plaintiff]'s motor behavior was restless, this is not an uncommon finding and there was no indication that the [plaintiff] would have more than moderate functional limitations. Dr. Hamrick stated that observations of a depressed, anxious, and slightly agitated affect could be based on facial expressions, but are not described, and he noted that mood is based on subjective reports. He further noted that the [plaintiff]'s attention and concentration were assessed to be mildly impaired and that an inability to complete serial threes from 20 is not suggestive of a marked limitation. He stated that findings of an inability to recall a five-digit or six-digit series was consistent with anxiety, but is not suggestive of any marked limitations of function.

Dr. Hamrick opined that the [plaintiff] would be able to perform simple, unskilled, and complex tasks, with no more than occasional contact with the public, coworkers, and supervisors. He also opined that there should be no more than an occasional requirement to learn new tasks or to deal with changes in the task environment, and that there should be a lower stress work environment, which he defined as without quotas or rapid paced work. In addition, he noted that tasks should involve things rather than people.

Tr. 965.

The ALJ provided an analysis of the opinions and findings:

The prior administrative medical findings of state agency, non-examining psychologists Pamela Green, Ph.D., Theodore Weber, Psy.D., Jeannie Nunez, Psy.D., and James Levasseur, Ph.D. – who reviewed the available evidence of record in August of 2021, October of 2021, November of 2024, and December of 2024,

respectively – are partially persuasive (see Exhibits 1A at 6-7, 9-11; 3A at 5-6, 7-9; 11A at 3-4, 5-6; 15A at 3-5, 5-7 [Tr. 108–09, 111–13, 122–26, 1061–64, 1079–83]). These consultants concluded that the [plaintiff]'s mental impairments caused up to moderate limitations in the broad areas considered under the "paragraph B" criteria (Id). Functionally, they essentially found that the [plaintiff] was able to understand, remember, and carry out simple (and "detailed" or "complex") instructions; but might have some difficulties accepting instructions and/or criticism from supervisors and getting along with co-workers, and was best suited to work in an environment with limited public interaction; and might have some difficulties setting realistic goals, but could react or adapt to most workplace changes and task demands (Id). These consultants supported their conclusions with detailed narrative explanations that contained specific citations to the medical and other evidence of record (Id). For example, Dr. Levasseur observed that in September of 2024, the [plaintiff] was noted to have judgment that could be affected by poor frustration tolerance and a volatile disposition, as well as elevated psychomotor activity, but a mostly euthymic affect, proper eye contact, lucid thought content, and thought processes that were organized, coherent, and goal-directed (Id). In addition, the conclusions of these consulting psychologists are largely consistent with the remainder of the record as a whole, which has generally shown the [plaintiff] to be engageable and interactive, with proper eye contact, organized and goal-directed thought processes, clearly articulated and spontaneous speech, lucid thought content, and no evidence of thought content abnormalities, such as delusional ideations (see, for example, Exhibits 17F at 58- 59, 72-73, 80, 98, 107; 18F at 5 [Tr. 1517–18, 1531–32, 1539, 1557, 1566, 1629]).

The opinions of consultative examining psychologist Dr. Kirkendall from October of 2021 are partially persuasive in this matter. He opined during that month that the [plaintiff] had marked limitations for maintaining a regular schedule and dealing appropriately with stress. However, this opinion is not supported by Dr. Kirkendall's own examination findings and is not consistent with the ongoing mental health treatment records from the VA, which have generally shown the [plaintiff] to exhibit a good response to treatment. As is discussed above, Dr. Hamrick testified that Dr. Kirkendall's examination findings did not support any marked limitations. Dr. Hamrick testified that the examination with Dr. Kirkendall in October of 2021 demonstrated the [plaintiff] to exhibit appropriate dress, appropriate grooming, appropriate eye contact, fluent speech, a clear voice, adequate expressive language,

11

and no evidence of any delusions or paranoia. Dr. Hamrick indicated that while the [plaintiff]'s motor behavior was restless, this is not an uncommon finding and there was no indication in Dr. Kirkendall's report that the [plaintiff] would have anything more than mild to moderate limitations of function. Dr. Hamrick indicated that the [plaintiff]'s depressed, anxious, and slightly agitated affect could be based on facial expressions, and he noted that mood is based on subjective reports. He noted that the [plaintiff]'s attention and concentration were mildly impaired and that his inability to complete the serial threes task from 20 does not suggest marked limitation. He also stated that the [plaintiff]'s inability to recall a five-digit or six-digit series was consistent with his anxiety, but are also not suggestive of any marked limitation.

Dr. Kirkendall's opinion that the [plaintiff] had a moderate limitation in his abilities to maintain attention and concentration is not supported by his examination finding of a "mild" impairment in attention and concentration (see Exhibit 7F at 4 [Tr. 864]). Nevertheless, in light of this finding of at least mild impairment, Dr. Hamrick's opinion of moderate limitations in this broad area, and the [plaintiff]'s PTSD and panic disorder symptoms, I conclude that the [plaintiff] has a moderate limitation in concentrating, persisting, and maintain pace.

Dr. Hamrick's opinions are persuasive. His opinions are supported by his detailed explanations during the hearing in February of 2023, and are consistent with the mental status examination findings in the longitudinal VA records, which have generally shown the [plaintiff] to exhibit good recall and good attention. As is discussed above in this decision, Dr. Hamrick explained in detail why he disagreed with the stated opinions of Dr. Bartholomae, Dr. Kirkendall, and Dr. Lindemuth. Dr. Hamrick's opinions are also consistent with the mental status examination observations of Dr. Kirkendall, with the [plaintiff]'s combination of mental impairments and accompanying symptomatology, and with the longitudinal mental status examination findings in the [plaintiff]'s treatment records, including those after Dr. Hamrick rendered his opinions (see, for example, Exhibits 17F at 58-59, 72-73, 80, 98, 107; 18F at 5 [Tr. 1517–18, 1531–32, 1539, 1557, 1566, 1629]).

Dr. Bartholomae's opinions are not persuasive. This … assessment was performed in conjunction with the [plaintiff]'s VA compensation and pension claim for an increase in his benefits, and as was noted by Dr. Hamrick, the evaluative criteria under the VA differs from that of the Social Security Administration. The objective and other

12

documentary evidence in the record does not demonstrate or suggest that the [plaintiff] would require accommodation in a workplace, despite the [plaintiff]'s subjective complaints and reported history based on his employment with his father. In addition, the mental status findings in the record do not support the opinions of Dr. Bartholomae, as they show that the [plaintiff] has exhibited a good attention span, good eye contact, good recall, coherent thought processes, and good judgment.

….

When Dr. Kirkendall evaluated the [plaintiff] again in May of 2024, he again opined that the [plaintiff] had marked limitations in maintaining a regular schedule and in appropriately dealing with stress (Exhibit 14F at 7 [Tr. 1396]). He further opined the [plaintiff] to have moderate limitations in maintaining attention and concentration, as well as in relating adequately with other people (Id). On the other hand, Dr. Kirkendall opined there to be no evidence of limitation in the [plaintiff]'s abilities to follow and understand simple directions and instructions; to perform simple tasks independently; to learn new tasks or perform complex tasks independently; or make appropriate decisions (Id). In short, Dr[.] Kirkendall provided essentially the same opinions in May of 2024 that he did several years earlier, in October of 2021. Again, his opinions are found to be partially persuasive for essentially the same reasons articulated above regarding his opinions from October of 2021. Dr. Kirkendall did support his opinions with the narrative report of his examination findings. However, he observed upon mental status examination in May of 2024 that the [plaintiff] made "no errors" on attention and concentration testing, and this observation does not reasonably support his opinion that the [plaintiff] had a moderate limitation in the broad functional area of maintaining attention and concentration. In addition, Dr. Kirkendall has contradicted himself in rendering his opinion in May of 2024, which further diminishes the degree to which he supported his conclusions (see Exhibit 14F at 7, 9-10 [Tr. 1396, 1398–99]). In the narrative portion of his opinion, Dr. Kirkendall opined that there was no evidence of limitation in the [plaintiff]'s abilities to independently perform complex tasks, and he stated that the [plaintiff] had a marked limitation in appropriately dealing with work stress (Id. at 7 [Tr. 1396]). When he completed a checkbox form, however, he opined that the [plaintiff] was moderately to markedly limited in understanding, remembering, and carrying out complex instructions, and he also endorsed that

13

the [plaintiff] was only moderately limited in responding appropriate to usual work situations and to changes in a routine work setting (Id. at 9-10 [Tr. 1398–99]). These internal inconsistencies further detract from the persuasiveness of Dr. Kirkendall's opinions from May of 2024. In any case, his conclusions that the [plaintiff] had up to marked limitation in work-related function are not reasonably consistent with his objective observations during this evaluation. In addition, Dr. Kirkendall's opinion that the [plaintiff] had up to marked limitations is not reasonably consistent with the rest of the record, including the more strongly supported opinion provided by medical expert Dr. Hamrick, as well as the longitudinal mental status examination findings (see Exhibits 17F at 58-59, 72-73, 80, 98, 107; 18F at 5 [Tr. 1517–18, 1531–32, 1539, 1557, 1566, 1629]).

Tr. 968–70.

About the plaintiff's VA disability rating, the ALJ provided this statement:

Per 20 C[.]F[.]R[. §] 404.1520b(c), I have not provided articulation of any evidence that is inherently neither valuable nor persuasive, including decisions rendered by other governmental agencies or non-governmental entities, including the Department of Veterans Affairs, as these are formulated under different standards than those by which we are bound by our own regulations (see Exhibits 8D; 13D; 1E; 2E; 1F at 79; 9F at 2 [Tr. 374–82, 394–97, 443–51, 711, 894]). The … [RFC] fully considers the [plaintiff]'s alleged mental symptoms and has significantly limited the degree of interaction he can have with others in the workplace, in addition to including several other mental work-related restrictions. However, the record as a whole does not support a finding of disability pursuant to our own Agency regulations, for the various reasons discussed in this decision.

Tr. 971.

Through the excerpted paragraphs, the ALJ complied with the regulations. Moreover, as the Commissioner observes, the plaintiff raises no challenge to findings that contradict the opinions on which he bases his argument; i.e., that the plaintiff's mental impairments result in no more than

14

moderate limitations, *see* Tr. 958–59; that the plaintiff's allegations about the intensity, persistence, and limiting effects of his impairments are not fully substantiated by the evidence, *see* Tr. 961–67; that Dr. Hamrick's opinions were the most persuasive of the medical opinions, *see* Tr. 969; or that the prior administrative medical findings of the state agency psychological consultants were partially persuasive, *see* Tr. 968. Doc. 14 at 12–13. As the Commissioner further observes, the plaintiff makes no attempt to reconcile Dr. Kirkendall's opinion that he has had the assessed limitations since the 1990s, *see* Tr. 1399, with his allegation that he did not become disabled until 2020, *see* Tr. 358. Doc. 14 at 13.

The plaintiff argues that the ALJ failed to discuss the consistency of Dr. Bartholomae's and Dr. Kirkendall's opinions, "which were supported by Dr. Bartholomae's note of symptoms" and by Dr. Kirkendall's mental status examination of the plaintiff. Doc. 11 at 17–18. This argument is unpersuasive. The ALJ compared Dr. Bartholomae's and Dr. Kirkendall's opinions to the other evidence, including to Dr. Hamrick's opinions and the mental-status examination findings. *See* Tr. 962–67, 969–70.

The plaintiff complains that the ALJ failed to cite the place in Dr. Kirkendall's examination report where Dr. Kirkendall noted that the plaintiff's attention and concentration were only mildly impaired. Doc. 11 at 18. This complaint is for naught. The ALJ provided an appropriate citation earlier. *See* Tr. 963 (citing Exhibit 7F, Tr. 861–67, which includes the note, "Attention and Concentration: Mildly impaired[.]").

The plaintiff argues that the ALJ erred by stating that Dr. Bartholomae's opinion was rendered as part of a VA compensation and pension examination that uses different standards. Doc. 11 at 18. Neither

error nor prejudice is shown. The ALJ also considered the objective and other documentary evidence, including findings from Dr. Bartholomae's examination of the plaintiff. *See* Tr. 962, 969.

The plaintiff argues that the ALJ's rejection or partial rejection of the opinion of every treating or examining source amounts to a substitution of the ALJ's "own opinion for that of qualified medical providers." Doc. 11 at 22–27. This argument is unpersuasive. The plaintiff relies on outdated regulations under which an ALJ generally gave more weight to medical opinions of treating or examining sources. Doc. 11 at 22–27; *see* 20 C.F.R. § 404.1527 (evaluating opinion evidence for claims filed before March 27, 2017). As explained above, the ALJ properly applied the revised regulations. Moreover, as the Commissioner observes, the ALJ relied on Dr. Hamrick's opinion and partially relied on the prior administrative medical findings to assess the RFC. Doc. 14 at 14; *see* Tr. 968–69.

## 4.

The plaintiff argues that the ALJ erred in finding that the plaintiff could do more than sedentary work. Doc. 11 at 27–29.

An ALJ must consider "the medical severity of [a claimant's] impairment(s)." 20 C.F.R. § 404.1520(a)(4)(ii). For an impairment to qualify as severe, the impairment must have lasted or be expected to last for a continuous period of at least twelve months. *Id*. § 404.1509. "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." *Id*. § 404.1522(a).

16

The ALJ found that the plaintiff has no severe physical impairment, finding the latest administrative medical findings persuasive. Tr. 957. In October 2021, Loc Kim Le, M.D., found no physical limitations and that the plaintiff's medically determinable physical impairments of essential hypertension and disorder of the skeletal spine were non-severe. Tr. 118–27. In November 2024, Edmund Molis, M.D., found no physical limitations and that the plaintiff's medically determinable physical impairment of essential hypertension was non-severe. Tr. 1059–1061. In December 2024, Shakra Junejo, M.D., affirmed the findings. Tr. 1077–79.

The plaintiff argues that the ALJ erred in evaluating his back impairment, relying on records during a two-month period in 2021 during which he had a diagnosed back impairment. Doc. 11 at 28–29 (citing Tr. 715, 719, 723, 727, 731, 735). The argument is unpersuasive because, as the Commissioner argues, the evidence at most would support that the plaintiff had a back impairment that was not disabling because it did not satisfy the twelve-month requirement, and the plaintiff otherwise fails to show error in the ALJ's reliance on the administrative medical findings. *See* Doc. 14 at 15.

### 5.

The plaintiff argues that the ALJ erred in finding an RFC with the limitation "to work that does not require fast[-]paced production quotas," *see* Tr. 960, while citing the hand packager job, which requires just that, *see* Tr. 972. Doc. 11 at 29–33.

At step five, an ALJ must decide whether a significant number of one or more jobs that the claimant can perform exist in the national economy. 20 C.F.R. § 404.1566(b). "The ALJ must articulate specific jobs that the claimant

17

is able to perform, and this finding must be supported by substantial evidence, not mere intuition or conjecture." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). For the finding, an ALJ may use a vocational expert's (VE's) testimony. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011). For a VE's testimony to be substantial evidence, the ALJ must pose a hypothetical question that includes all of the claimant's impairments. *Id.*

Effective January 6, 2025, the SSA rescinded Social Security Ruling (SSR) 00-4p and replaced it with SSR 24-3p.[3] *See Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1362 (11th Cir. 2018) (relying on now-rescinded SSR 00-4p for its holding). The new ruling explains how an ALJ may use VE evidence:

> Our adjudicators must determine whether … VE evidence is adequate to decide the claim and must do so efficiently. … VEs may provide evidence based on their professional experience and any reliable source of occupational information that is commonly used in the vocational profession and relevant under our rules. … VEs are in the best position to determine the most appropriate sources of data to support the evidence they offer. We expect … VEs to

---

[3]The new ruling applies under the following circumstances:

> [The agency] will use this SSR beginning on its applicable date. [The agency] will apply this SSR to new applications filed on or after the applicable date of the SSR and to claims that are pending on or after the applicable date. This means that we will use this SSR on and after its applicable date in any case in which we make a determination or decision. We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions. If a court reverses our final decision and remands a case for further administrative proceedings after the applicable date of this SSR, we will apply this SSR to the entire period at issue in the decision we make after the court's remand.

SSR 24-3p, 89 Fed. Reg. 97159, 2024 WL 5256890 (Dec. 6, 2024). The new ruling applies here because the decision followed the effective date. *See* Tr. 973.

> identify the sources of the data they use and, where applicable, to explain their general approach to estimating job numbers. If the … VE uses a data source that defines exertion, education, or skill levels differently than our regulations, we expect the … VE to explain the difference. We may instruct … VEs to address other concerns as needed. For example, … VEs should identify and explain if they cite an occupation that is performed in a different way than identified in the source of data they used. Because VEs … are impartial and qualified professionals whom we consult because of their expertise, a more detailed inquiry into the sources of data or approaches used is not usually required. At the hearing level, when the claimant is represented, we expect the representative to raise any relevant questions or challenges about the VE's testimony at the time of the hearing and to assist in developing the record through appropriate questions to the VE. Based on the vocational evidence in the case and the record overall, an adjudicator will determine whether the evidence provided by a … VE is adequate to support a decision[.]

SSR 24-3p, 89 Fed. Reg. 97160, 2024 WL 5256890 (Dec. 6, 2024) (footnote omitted).

The Dictionary of Occupational Titles (DOT) provides a description of "Hand Packager":

> Packages materials and products manually, performing any combination of following duties: Cleans packaging containers. Lines and pads crates and assembles cartons. Obtains and sorts product. Wraps protective material around product. Starts, stops, and regulates speed of conveyor. Inserts or pours product into containers or fills containers from spout or chute. Weighs containers and adjusts quantity. Nails, glues, or closes and seals containers. Labels containers, container tags, or products. Sorts bundles or filled containers. Packs special arrangements or selections of product. Inspects materials, products, and containers at each step of packaging process. Records information, such as weight, time, and date packaged. May stack, separate, count, pack, wrap, and weigh bakery products and be designated Bakery Worker (bakery products). May apply preservative to aircraft and spaceship parts, package parts for shipment, and be designated Wrapper and Preserver (aircraft mfg.). May be designated according to whether high-production or small-lot packaging as Fancy Packer (retail

trade; wholesale tr.); Packaging-Line Attendant (any industry); specific packaging duty performed as filling, wrapping, packing, labeling, and container cleaning as Sack Sewer, Hand (any industry); kinds of equipment used or product packaged as Candle Wrapper (fabrication, nec); Carton Stapler (any industry); or whether packager performs associated duties as final assembly before packaging product as Novelty-Balloon Assembler And Packer (rubber goods). May weigh and package meat in retail store and be designated Meat Wrapper (retail trade). May be designated: Bagger (any industry); Bow Maker, Gift Wrapping (any industry); Box Maker, Cardboard (any industry); Box Wrapper (any industry); Bundler (any industry); Candy Packer (sugar & conf.); Caser, Rolled Glass (glass mfg.); Coil Strapper (steel & rel.); Container Filler (any industry); Filler (any industry); Furniture Packer (retail trade); Grader, Sausage And Wiener (meat products); Guncotton Packer (chemical); Inserter, Promotional Item (any industry); Inspector-Packager (any industry); Lidder (any industry); Mattress Packer (furniture); Packager, Meat (meat products); Packer, Dried Beef (meat products); Packer, Foamed-In-Place (any industry); Packer, Sausage And Wiener (meat products); Piece-Goods Packer (textile); Scaler, Sliced Bacon (meat products); Sponge Packer (wholesale tr.); Stamper (any industry); Table Worker (any industry); Tube Packer (rubber tire); Wrapper (any industry); Wrapper, Hand (can. & preserv.); Wrapping Remover (any industry). Workers who tend packaging machines are classified under PACKAGER, MACHINE (any industry) 920.685-078.

DOT 920.587-018, 1991 WL 687916.

The ALJ found that the plaintiff has the following residual RFC:

[T]he [plaintiff] has the [RFC] to perform a range of work at all exertional levels, but with non-exertional limitations that he is unable to: understand, remember, and carry out more than simple instructions; use judgement to make more than simple work-related decisions in a routine work setting; and have more than occasional interaction with supervisors, co-workers, and the general public. He is limited to work that does not require fast[-]paced production quotas.

Tr. 960.

20

The VE testified that someone with the same age, education, work history, and RFC as the plaintiff could perform the job of "Hand Packager," DOT 920.587-018. Tr. 1003. The ALJ asked the VE about the limitation requiring no fast-paced production quotas, and the VE provided this response:

> There's no production quotas, other than what is typically required in the performance of a work-related activity. I mean, there's—you don't have to package so many items at … a certain amount of time. That you package them as … they come as you do them. As long as you just remain on task, there's no quotas required in those jobs, but you do have to keep up with your pace, just like you would in any type of work.

Tr. 1003–04. The VE testified that he was relying on data from the DOT. Tr. 1004. The plaintiff's representative examined the VE but did not ask about the testimony on quotas. *See* Tr. 1005–08, 1012–13. The ALJ adopted the testimony. Tr. 973.

The ALJ's finding regarding the Hand Packager job is supported by substantial evidence; specifically, the VE's testimony based on a hypothetical that included all of the RFC's limitations. The plaintiff, relying on a series of non-binding cases involving different circumstances, shows no error. *See* Doc. 11 at 29–31 (citing *Corbitt v. Kijakazi*, No. 2:20-cv-771-CWB, 2023 WL 2703996, at *6 (M.D. Ala. Mar. 29, 2023) (finding an RFC with "no fast-paced production work such as conveyor belt or quota-based work"); *Tolen v. Comm'r of Soc. Sec.*, No. 2:23-cv-993-NPM, 2025 WL 750331, at *3 (M.D. Fla. Mar. 10, 2025) (finding an RFC with "work that is not fast[-]paced with no work with assembly line/conveyor belts"); *Dillon v. Saul*, No. 8:19-cv-1277-T-AEP, 2020 WL 5640770, at *4 (M.D. Fla. Sept. 22, 2020) (relying on SSR 00-4p, since replaced, to rule that "an apparent conflict exists between the

ALJ's finding that Plaintiff could not perform a job requiring production rate or pace work comparable to that of an assembly line where one worker's pace affects the entire production process and the VE's identification of the jobs of sorter and routing clerk, which each involve use of a conveyor belt"); *Johnson v. Berryhill*, No. 4:16-cv-106-HBB, 2017 WL 4542228, at *2 (W.D. Ky. Oct. 11, 2017) (noting that the SSA "has publically [sic] acknowledged the DOT's vulnerability to obsolescence and has mounted an enormous effort to ensure ALJs have access to reliable occupational information"); *Beverly Ann K. v. Kijakazi*, No. 1:22-cv-0028 (AMN), 2023 WL 3004779, at *11 (N.D.N.Y. Mar. 2, 2023) (declining to address the argument that the ALJ erred in failing to consider Occupational Requirements Survey (ORS) data for representative occupations); *Orozco v. Kijakazi*, No. 21-56263, 2022 WL 17844618, at *2 (9th Cir. Dec. 22, 2022) (remanding because the ALJ's decision failed to explain how the VE's estimate of the number of particular jobs were impacted by literacy or educational requirements raised in rebuttal evidence); *Roth v. Comm'r of Soc. Sec.*, No. 6:20-cv-550-MRM, 2021 WL 4399125, at *9 (M.D. Fla. Sept. 27, 2021) (remanding because the ALJ failed to consider the plaintiff's post-hearing memorandum with evidence from ORS on job numbers); *Hernandez v. Saul*, No. CV 19-1299-AS, 2020 WL 1156402, at *4–5 (C.D. Cal. Mar. 10, 2020) (remanding because the ALJ failed to address an apparent conflict between the plaintiff's inability to speak English and the DOT descriptions of jobs the VE and ALJ identified; observing that the ALJ was not obligated to address non-DOT sources at the hearing; and stating that the plaintiff demonstrated that evidence submitted to the Appeals Council "merits further consideration with a VE on remand")). While the ALJ could have rejected the VE's testimony because the VE did not rely on or

address ORS data for Group 53-7064 ("Packers and Packagers, Hand") when giving his opinion and explanation, no law requires such rejection or reliance.

**6.**

The plaintiff argues that the ALJ erred in failing to include in the RFC any limitation to address his moderate limitation in adapting or managing himself or any explanation of why a limitation is unnecessary. Doc. 11 at 33–36.

Vacatur is warranted if an ALJ finds at step two that a claimant has a moderate limitation in an area of mental functioning, fails to indicate that the medical evidence shows the claimant's ability to work is unaffected by the limitation, fails to include or otherwise implicitly account for the limitation in the hypothetical posed to the VE, and relies on the VE's testimony for the step-five finding. *Winschel*, 631 F.3d at 1181.

Adapting or managing oneself "refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(E)(4). The following are examples of mental functioning in this area:

> Responding to demands; adapting to changes; managing … psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making [personal plans] independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.

*Id.*

The ALJ found that the plaintiff is moderately limited in adapting or managing himself, providing the following explanation:

> In his initial function report from April of 2021, the [plaintiff] alleged that he did not handle stress well "at all" – and he said he stayed in a daily routine and thus did not handle changes in routine (see Exhibit 8E at 7 [Tr. 481]). However, [he] also acknowledged that he could drive a car, leave his home unaccompanied, and shop in stores for groceries (Id. at 4 [Tr. 478]). In May of 2024, [he] was noted to exhibit "fair" insight and judgment, and his thought processes were described as coherent and goal-directed (see Exhibit 14F at 5–6 [Tr. 1394–95]). [He] has been noted to exhibit judgment that is affected by poor frustration tolerance and a volatile disposition (see Exhibits 17F at 58–59, 72–73, 80, 98, 107; 18F at 5 [Tr. 1517–18, 1531–32, 1539, 1557, 1566, 1629]). He has not generally been noted to exhibit any overt indications of thought content abnormalities, however, such as delusions or paranoia (Id). The evidence as a whole is consistent with a conclusion that the [plaintiff] is moderately limited in adapting or managing himself.

Tr. 959.

As stated, the ALJ found that the plaintiff has the following RFC:

> [T]he [plaintiff] has the [RFC] to perform a range of work at all exertional levels, but with non-exertional limitations that he is unable to: understand, remember, and carry out more than simple instructions; use judgement to make more than simple work-related decisions in a routine work setting; and have more than occasional interaction with supervisors, co-workers, and the general public. He is limited to work that does not require fast[-]paced production quotas.

Tr. 960. The ALJ stated that the RFC "reflects the degree of limitation" he found. Tr. 960.

The ALJ accounted for the moderate limitation in the RFC by including limitations that precluded making more than simple, work-related decisions in a routine work setting; having more than occasional interaction with

24

supervisors, co-workers, and the general public; and meeting fast-paced production quotas. *See* Tr. 960.

The plaintiff relies on two cases to argue error: *Schink v. Commissioner of Social Security*, 935 F.3d 1245, 1269 (11th Cir. 2019), and *Arce v. Commissioner of Social Security*, No. 23-11315, 2024 WL 36061, at *2 (11th Cir. Jan. 3, 2024). Doc. 11 at 33–36. In *Schink*, the Eleventh Circuit explained:

> [A]lthough the ALJ stated he "considered all symptoms" when assessing Schink's RFC, the content of his decision demonstrates he did not. Nearly the entire section of the ALJ's opinion relating to RFC discusses Schink's physical impairments. … [T]he ALJ's ultimate conclusions as to RFC do not include even a single finding about Schink's mental capacities. Instead, the ALJ's findings concern Schink's physical capacities exclusively.

935 F.3d at 1269. In *Arce*, the Eleventh Circuit explained:

> Here, as in *Schink*, the ALJ did not apply the correct legal standards, and remand to the Commissioner for further proceedings is necessary. Although the ALJ found mild mental impairments in her step 2 analysis, her RFC assessment at step 4 apparently was limited to Arce's physical abilities and impairments and erroneously omitted considering her mental ones. To support her conclusion that Arce could perform work in the national economy—including that of order clerk, telephone information clerk, and charge account clerk—the ALJ had to consider all the duties of that work and evaluate Arce's ability to perform those duties despite all her impairments, severe and non-severe. Accordingly, a remand is necessary for the ALJ to consider how Arce's non-severe mental limitations affected her RFC.

2024 WL 36061, at *2. Unlike in *Schink* and *Arce*, the ALJ found mental limitations and an RFC that accounted for them, and wrote a detailed decision explaining her reasoning. *See* Tr. 960–71.

**7.**

The Commissioner's final decision is **affirmed**. The clerk is **directed** to enter judgment in favor of the Commissioner of Social Security and against Stephen Meeks and close the file.

**Ordered** in Jacksonville, Florida, on May 29, 2026.

Patricia D. Barksdale
United States Magistrate Judge

26